**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TIMAERO IRELAND LIMITED, | |
| Plaintiff, | Case No. |
| v. | JURY TRIAL DEMANDED |
| THE BOEING COMPANY, | |
| Defendant. | |

## COMPLAINT

Plaintiff Timaero Ireland Limited ("Timaero"), by and through its attorneys, Whitmyer IP Group LLC, for its Complaint against Defendant The Boeing Company ("Boeing"), alleges as follows:

### THE PARTIES

1. Plaintiff Timaero is an Irish private company with a principal place of business at 1 Grant's Row, 2nd Floor, Mount Street Lower, Dublin 2, Ireland. Timaero engages in leasing, sub-leasing, sale, and purchase of air transport vehicles.

2. Defendant Boeing is a Delaware corporation that has a principal place of business and corporate headquarters located at 100 North Riverside, Chicago, Illinois 60606. Boeing is in the business of, *inter alia*, designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, distributing, and selling aircraft, including the 737 MAX that is the subject of this lawsuit.

### JURISDICTION AND VENUE

3. Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1332, diversity jurisdiction, in that this is an action between a citizen of a state and a citizen of a foreign state, and

1

the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Boeing because Boeing is a citizen and resident of the State of Illinois and because it maintains its principal place of business and corporate headquarters in Chicago, Illinois. At all relevant times, Boeing has been authorized to do business, and has been transacting or conducting business, in the State of Illinois.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Boeing resides in Chicago, Illinois. Boeing has its principal place of business and corporate headquarters in Chicago, Illinois, and has, at all relevant times, conducted business there.

**SUMMARY**

6.      This is a complaint for fraudulent inducement, breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with business expectancy.

7.      Timaero contracted with Boeing to purchase twenty-two (22) Boeing Model 737 MAX airplanes. Boeing represented that the 737 MAX would be airworthy, safe, free from design defects, and in compliance with appropriate aviation regulations.

8.      The 737 MAX Boeing designed and manufactured was not safe for flight. Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashed due to Boeing's misrepresentations and negligence, killing 346 people. These deaths are a result of Boeing's negligent actions and decisions in designing a defective aircraft that fails to meet aviation regulations and further withhold critical information from the United States Federal Aviation Administration ("FAA"), foreign regulators, and Boeing customers.

9.      Timaero is and continues to be damaged by Boeing's actions.

## FACTS

### *Contract Between Timaero and Boeing*

10.     Timaero is a financial organization in the business of purchasing aircraft and leasing/selling them for profit.

11.     On January 10, 2014, Boeing and Timaero entered into Purchase Agreement Number PA-04022 ("Purchase Agreement") for the purchase and sale of twenty (20) Boeing Model 737-8 aircraft ("737 MAX").[1]

12.     The Purchase Agreement incorporated the terms and conditions of the Aircraft General Terms Agreement dated January 10, 2014, identified as VEB-AGTA.

13.     The Purchase Agreement also incorporated numerous letter agreements, tables, exhibits, and supplemental agreements.

14.     On September 15, 2016, Timaero and Boeing entered Supplemental Agreement No. 1, wherein the parties agreed to convert two (2) Boeing 737-800 aircraft from a prior purchase agreement into two (2) Boeing 737 MAX aircraft. Supplemental Agreement No. 1 was an amendment to and was incorporated into the Purchase Agreement. Therefore, Timaero purchased a total of twenty-two (22) 737 MAX aircraft from Boeing under the Purchase Agreement.

15.     On August 28, 2017, Timaero and Boeing entered Supplemental Agreement No. 2. On November 12, 2017, Timaero and Boeing entered Supplemental Agreement No. 3. On February 26, 2018, Timaero and Boeing entered Supplemental Agreement No. 4. On September

---

[1] The Purchase Agreement and exhibits and supplements thereto contain Boeing's confidential business information. Accordingly, Timaero does not attached them here. Timaero can file these documents under seal at the Court's request, if Boeing does not agree to waive confidentiality for the purposes of this litigation.

21, 2018, Timaero and Boeing entered Supplemental Agreement No. 5. On September 28, 2018, Timaero and Boeing entered Supplemental Agreement No. 6. On November 29, 2018, Timaero and Boeing entered Supplemental Agreement No. 7.

16. At all times, Timaero has acted in accordance with its contractual obligations under the Purchase Agreement. Timaero has made all advanced payments in accordance with its contractual schedule. Timaero accepted two aircraft provided by Boeing under the Purchase Agreement.

17. While Boeing delivered two (2) 737 MAX aircraft to Timaero in December 2018, as explained in detail below, Boeing has not honored its obligations under the Purchase Agreement. Not only has Boeing misrepresented the airplanes and fraudulently induced Timaero to enter the contract, Boeing failed to deliver any further aircraft in accordance with its contractual obligations in the Purchase Agreement.

18. On December 16, 2019, Boeing announced that it is suspending production of the 737 MAX starting in January 2020.[2] That same day, Stanley A. Deal, President & CEO of Boeing Commercial Airplanes, wrote to Timaero to inform it of Boeing's decision to suspend production and delivery of Timaero's aircraft until a time uncertain.

19. The 737 MAX aircraft contracted for between Boeing and Timaero are now either worthless or seriously diminished in value. Timaero therefore has been harmed and continues to be harmed by Boeing's wrongful actions.

---

[2] Jon Sindreu, Boeing's Crisis Management Keeps Falling Short, THE WALL STREET JOURNAL (December 16, 2019), https://www.wsj.com/articles/boeings-crisis-management-keeps-falling-short-11576518561.

### *The Boeing 737 MAX*

Boeing's Design of the New 737 MAX and its MCAS

20.     Boeing designed its first 737 aircraft in the 1960s. The 737 aircraft has been updated since then in various series, such as "Original," "Classic," and "Next Generation." Boeing's 737 MAX is the latest 737 aircraft series.

21.     In 2011, Boeing considered designing an entirely new model of aircraft to replace the 737, but pressure was mounting from customers who were considering purchasing the rival Airbus A320neo. Full-scale design and production of a new aircraft would require nearly a decade of development, new FAA certification, and additional training for airline crews. Boeing did not have such time and could not inflict such costs on their customers.

22.     Desperate to retain its market share against Airbus, Boeing instead chose to redesign the 737. Boeing's redesign of the 737 MAX had more powerful and fuel-efficient engines that are physically larger than those of previous 737 designs. The new engines were moved forward on the wing compared to previous 737s in order to fit below the low wing profile. The 737 MAX's aerodynamics and flight behavior were radically changed by the larger size and weight and positioning of the new engines.

23.     During development of the 737 MAX in 2012, wind tunnel tests exposed the tendency of the 737 MAX to pitch up during extreme flight conditions, which could impact the pilot's control of the aircraft. Boeing engineers tried and failed to develop a physical, aerodynamic solution to the problem.

24.     To stabilize the 737 MAX, Boeing chose to use a Maneuvering Characteristics Augmentation System ("MCAS"), which had never been used on a commercial aircraft. MCAS utilized software to compensate for any upward pitches without pilot input. The MCAS works by

receiving data from an angle of attack sensor on the plane's nose. If the data shows that the plane is pitching too high, the MCAS directly engages the tail's horizontal stabilizer to level the plane. No pilot input is necessary.[3]

25.     MCAS was originally developed for the KC-46A Pegasus Air Force Tanker around the early 2000s.[4] The KC-46A's MCAS was designed by Boeing to rely on inputs from multiple sensors and with limited power to move the tanker's nose—deliberate checks against the system acting erroneously or causing a pilot to lose control.[5]

26.     The MCAS also makes the 737 MAX appear to pilots as handling like older 737s. Boeing took a position that pilots did not need to know about the MCAS or be trained to use the new system to allow the 737 MAX to earn a common "type rating" with existing 737 models. This allowed airlines to minimize training of pilots moving from previous generations of the 737 series to the 737 MAX. Minimizing 737 MAX pilot transition training was an important cost saving for Boeing's airline customers, and therefore, a key selling point. Boeing was so confident in the MCAS system, it even offered to pay millions of dollars if simulation training was found necessary.

27.     Boeing continues to advertise the 737 MAX based on its commonality with the previous Next Generation 737:

---

[3] *See*, Dominic Gates and Mike Baker, The inside story of MCAS: How Boeing's 737 MAX system gained power and lost safeguards, SEATTLE TIMES (June 24, 2019), https://www.seattletimes.com/seattle-news/times-watchdog/the-inside-story-of-mcas-how-boeings-737-max-system-gained-power-and-lost-safeguards/.

[4] Alison Sider and Andrew Tangel, Before 737 MAX, Boeing's Flight-Control System Included Key Safeguards, THE WALL STREET JOURNAL (Sept. 29, 2019), https://www.wsj.com/articles/before-737-max-boeings-flight-control-system-included-key-safeguards-11569754800.

[5] *Id.*

**Airlines ask for an airplane that fits smoothly in today's fleet**

Because of the 737's popularity with airlines everywhere around the world, integrating the new 737 MAX is an easy proposition. As you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737, ease of maintenance, wide availability of 737 pilots, and the global infrastructure that supports the aircraft in operation.[6]

28.     For the 737 MAX, MCAS was originally envisioned to automate corrective actions in cases of high angle of attack and G-forces beyond normal flight conditions at high airspeeds.[7] In other words, MCAS was to rarely activate, especially during normal flight. Even if MCAS activated, it was to have little authority. As originally designed, MCAS could only nudge the plane, affecting the tail's horizonal stabilizer a maximum of about 0.6 degrees during a period of about 10 seconds. Such a nudging helped the plane at high speeds, but would have less impact at lower speeds, such as those experienced during take-off. Multiple angle-of-attack sensors were to provide data to MCAS.

29.     Boeing detailed its plans for MCAS to the FAA in a System Safety Analysis. Instead of having the MCAS assessed by the FAA, Boeing engineers authorized to work on behalf of the FAA drafted the System Safety Analysis for the MCAS, a report used as part of aircraft flight certification.

30.     Boeing represented to the FAA that the MCAS was engineered "to address potentially unacceptable nose-up pitching moment at high angles of attack at high airspeeds."

---

[6] Easy To Operate, BOEING, http://www.boeing.com/commercial/737max/by-design/#/operational-commonality.

[7] Angle of attack is the angle between the wing and the oncoming air flow. G-force is the plane's acceleration in the vertical direction.

Boeing also represented to the FAA and foreign safety regulators that MCAS is limited to moving the horizontal stabilizer 0.6 degrees.

31. Boeing also performed a failure analysis for MCAS, during which failure scenarios are determined to be either minor, major, hazardous, or catastrophic. The scenario categorization helps determine the redundancy for an aircraft system. For major failures, no serious injuries are expected, though flight crew may have additional tasks or complexities. A single sensor is typically sufficient for systems categorized as major. Hazardous failures can cause serious and fatal injuries, and require multiple sensors if there is a high probability of occurrence during normal flight. Loss of the aircraft is reserved for catastrophic failures.

32. Boeing determined MCAS failure during regular flight to be a major event, though in extreme, unlikely flight conditions, MCAS failure could be hazardous (not catastrophic). Boeing's failure analysis did not consider the effect of multiple actuations of the MCAS. Boeing's analysis also assumed that pilots will react quickly and properly if failure arose. Boeing knew or should have known MCAS failure should have been categorized as catastrophic.

Boeing Changed the Design of the MCAS During Development and Failed to Inform the FAA

33. By 2015, development of the 737 MAX was behind that of the Airbus A320neo. To keep from losing market share, Boeing needed its new 737 MAX flight-certified quickly. However, the 737 MAX was not well received following test flights in 2016. Test pilots identified the same pitch problems that led to the development of MCAS, but this time at low-speed flight.

34. Boeing decided to expand the use of MCAS to lower-speed situations, including during takeoff. Boeing also allowed the tail stabilizer to move up to 2.5 degrees in 10 seconds, over 4 times faster than previous design. This allowed the MCAS to work at lower speeds where additional movement horizontal stabilizer is required to steer. Maximum nose down of the

horizontal stabilizer could now be achieved in only two iterations of MCAS activation.

35.    Boeing also removed the G-force threshold for activating MCAS, causing it to be triggered by only a single angle of attack sensor. Despite these choices, Boeing chose to retain the failure assessment categorized as major, and did not add any redundancy.

36.    Boeing did not perform an additional safety analysis, or inform the FAA of its changes to the MCAS design. Boeing never informed the FAA of the expansion of MCAS' authority in low-speed situations. Boeing also did not inform the FAA that MCAS' control was expanded to move the tail stabilizer from 0.6 to 2.5 degrees in 10 seconds, that the MCAS could be triggered successively, or that MCAS would be triggered by only a single angle of attack sensor.

37.    Boeing knew of the fatal flaws of its MCAS. In 2016, the chief technical pilot for the 737 MAX told a colleague in a text that MCAS was "running rampant" and was "egregious" in a simulator.[8] A June 2018 Boeing document stated that if a pilot took more than ten seconds to react to mistaken MCAS activation, the result could be "catastrophic."[9]

38.    Boeing also chose not to notify pilots that the MCAS was operating on the 737 MAX. Boeing chose not to describe the MCAS in the flight crew operations manual (FCOM), which is the master description of the aircraft for pilots.

39.    The 737 MAX's chief technical pilot Mark Forkner sent a March 30, 2016 email to senior FAA officials requesting to remove MCAS from the pilot's manual. Mr. Forkner and Boeing never reported that MCAS was being redesigned to operate at lower flight speeds to the FAA. Instead, FAA officials had only been informed regarding the original version of MCAS,

---

[8] Alec MacGillis, The Case Against Boeing, THE NEW YORKER (Nov. 11, 2019), https://www.newyorker.com/magazine/2019/11/18/the-case-against-boeing.

[9] *Id.*

represented by Boeing to be benign and rarely used. Relying on Boeing, the FAA approved Boeing's request.

40.     Boeing also advocated for and received a requirement of only one hour of training through an iPad for pilots regarding the difference between the 737 MAX and older 737s that included no mention of MCAS.

41.     Pilots repeatedly voiced safety concerns about the Boeing 737 Max 8, with one captain calling the flight manual "inadequate and almost criminally insufficient" and another stating that it was "unconscionable" that Boeing allowed the plane to be flown with inadequate pilot training and disclosures.[10]

The MCAS Design is Defective

42.     Boeing's MCAS design is deeply flawed and defective.

43.     As a first example, MCAS relies on a single angle of attack sensor, though there are two such sensors on the plane. If the angle of attack sensor is damaged, faulty, or provides corrupt data, the MCAS can force the 737 MAX into an unrecoverable dive due to this single point of failure. In 2015, a Boeing employee asked in an e-mail, "Are we vulnerable to single AOA sensor failures with the MCAS implementation…."[11] Despite this knowledge, Boeing failed to enable a second, already existing, angle of attack sensor for use by the MCAS. Boeing also made an alert system, which would detect and notify flight crew of any inconsistencies between the two angle of attack sensors, an optional add-on feature at an additional cost.

---

[10] Cary Aspinwall, Ariana Giorgi, and Dom DiFurio, Several Boeing 737 Max 8 pilots in U.S. complained about suspected safety flaw, THE DALLAS MORNING NEWS (March 12, 2019), https://www.dallasnews.com/business/airlines/2019/03/12/several-boeing-737-max-8-pilots-in-u-s-complained-about-suspected-safety-flaw/.

[11] Id.

44.     Boeing knew or should have known that MCAS' reliance on a single angle of attack sensor is reckless and would lead to catastrophe.

45.     As a second example, previous versions of the 737 cut electric power to a horizontal stabilizer if a pilot placed resistance against the control column in the opposite direction of the stabilizer's movement. However, when MCAS is activated, this feature is disabled on the 737 MAX.

46.     Boeing knew or should have known that disabling this feature when MCAS is enabled is reckless and would lead to catastrophe.

47.     As a third example, while activating electric trim control on the yoke may temporarily stop the MCAS' movement of the tail's horizontal stabilizer, the MCAS will reactivate after a few seconds and continue to force the nose down if the angle of attack is still sensed as being too high. In other words, the MCAS will trigger a movement of the horizontal stabilizer multiple times in rapid succession. Two cycles of MCAS activation are enough to achieve maximum nose-down effect.

48.     Boeing knew or should have known that repeated triggering of MCAS is reckless and would lead to catastrophe.

49.     Notably, the earlier KC-46A's MCAS had none of these flaws. It relied on multiple sensor inputs, had limited authority to move the tanker's nose, and only activated the horizontal stabilizer once, not repeatedly.[12] Pilots of the tanker can also override MCAS by simply pulling

---

[12] Alison Sider and Andrew Tangel, Before 737 MAX, Boeing's Flight-Control System Included Key Safeguards, THE WALL STREET JOURNAL (Sept. 29, 2019), https://www.wsj.com/articles/before-737-max-boeings-flight-control-system-included-key-safeguards-11569754800.

back on controls.[13]

### Crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302 and Boeing's Response

50.     On October 29, 2018, a 737 MAX flown by Lion Air as Flight 610 crashed 13 minutes after takeoff, killing all 189 people aboard.

51.     On March 10, 2019, a 737 MAX flown by Ethiopian Airlines as Flight 302 crashed six minutes after takeoff, killing all 157 people aboard.

52.     Both the Lion Air and Ethiopian Airlines flights were a result of MCAS malfunction.

53.     After the crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302, all 737 MAX aircraft have been grounded worldwide since early 2019.

<u>Lion Air Flight 610 Crash</u>

54.     On October 29, 2018, a 737 MAX flown by Lion Air took off from Jakarta for Pangkal Pinang, Indonesia with its crew of eight and a hundred and eighty-one passengers.

55.     During the flights' initial ascent, the pilots asked air traffic control for help determining their correct altitude and airspeed.  Air traffic control was told by the crew that the plane needed to turn back because instruments were providing inconsistent information.

56.     The 737 MAX's angle of attack sensor used by the MCAS falsely indicated that the plane's nose was pointed too high. The MCAS forced the plane's nose down. The pilots responded by trying to lift the plane's nose back up, but the repeated triggering of the automated MCAS made it impossible for the pilots to regain control of the aircraft.

57.     Due to the MCAS, Lion Flight 610 crashed into the Java Sea approximately thirteen

---

[13] *Id.*

minutes after takeoff, killing all 189 people on board.

Ethiopian Airlines Flight 302

58.     On March 10, 2019, a 737 MAX flown by Ethiopian Airlines took off from Addis Ababa, Ethiopia for Nairobi, Kenya with 157 aboard.

59.     Approximately one minute into the flight, the pilot reported a "flight control" problem, and asked for clearance to return to Addis Ababa, which he was granted. The 737 MAX aircraft was experiencing unstable vertical speed after takeoff, fluctuating altitude and rate of climb and descent, and unsafe acceleration.

60.     The 737 MAX's angle of attack sensor used by the MCAS falsely indicated that the plane's nose was pointed too high. The MCAS forced the plane's nose down. The pilots responded by trying to lift the plane's nose back up, but the repeated triggering of the automated MCAS made it impossible for the pilots to regain control of the aircraft.

61.     Due to the MCAS, Flight control lost contact with the 737 MAX aircraft, which crashed near the town of Bishoftu six minutes after takeoff, killing all 157 people aboard.

Boeing's Response to the Catastrophic Failure of its 737 MAX Aircraft

62.     Boeing knew or should have known that the MCAS was responsible for the Lion Air crash. Boeing warned of a possible fault in the aircraft's angle of attack system by updating the flight crew operations manual for the 737 MAX about a week after the Lion Air crash.

63.     After the crash of Lion Air Flight 610, Boeing for the first time provided to airlines details about the MCAS, including the MCAS' 2.5 degree movement of the horizontal stabilizer and the fact that it can be triggered multiple times.

64.     A November 2018 FAA analysis following the Lion Air crash projected up to 15

additional catastrophic failures over the 30-45 year lifespan of 737 MAX fleet.[14]

65.     The FAA issued Emergency Airworthiness Directive ("Emergency AD") 2018-23-51 on November 7, 2018.  The Emergency AD provided mandatory warnings and instructions regarding "unsafe condition[s] … likely to exist or develop" to "owners and operators of The Boeing Company Model 737-8 and -9 airplanes."

66.     The Emergency AD "was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer." The Emergency AD "address[ed] this potential . . . nose-down trim, which could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down altitude, significant altitude loss, and possible impact with terrain."

67.     The Emergency AD further revised instructions to flight crews in the operating procedures of the flight manual "in the event an uncommanded nose down stabilizer trim is experienced on the 737-8/-9." The Emergency AD instructed the flight crew to follow the "Runaway Stabilizer procedure," which states to "[d]isengage autopilot and control airplane pitch attitude with control column and main electric trim as required. If relaxing the column causes the trim to move, set stabilizer trim switches to CUTOUT. If runaway continues, hold the stabilizer trim wheel against rotation and trim the airplane manually." The Emergency AD failed to provide a detailed description of the MCAS.

68.     Boeing's solution of treating an MCAS malfunction as a runaway stabilizer has

---

[14] Andy Pasztor and Andrew Tangel, Internal FAA Review Saw High Risk of 737 MAX Crashes, THE WALL STREET JOURNAL (December 11, 2019), https://www.wsj.com/articles/internal-faa-review-saw-high-risk-of-737-max-crashes-11576069202

been challenged by pilots and aviation experts. First, in contrast to a runaway stabilizer's continuous movement, an MCAS' failure causes an uncommanded movement that, even if counteracted by a pilot, is triggered by MCAS again. Second, the MCAS disables the ability of a pilot to cut electric power to a stabilizer, which can interrupt any stabilizer movement.

69.     Boeing downplayed the MCAS' significant problems and failed to take adequate preventative measures. Boeing also failed to inform the public and customers, such as Timaero, of the danger MCAS presented. Boeing further failed to adequately disclose the significant differences between the 737 MAX and its predecessors.

70.     Thus, Timaero and others were unable to make informed purchasing decisions.

71.     Even following the two crashes, Boeing continued to fail to take appropriate action as it was concerned with the economic impact to its business. Boeing was concerned airlines would ground aircraft, cancel orders, or purchase new aircraft from its rival Airbus. Boeing deliberately downplayed the unsafe nature of its defective aircraft, and falsely lured the public into believe the 737 MAX was airworthy and safe.

72.     The world grounded the Boeing 737 MAX following the Ethiopian Airlines crash. China was the first country to do so on March 11, 2019. Dozens of countries followed. On March 13, 2019, the FAA issued a temporary ban on the 737 MAX. The FAA's Emergency Order of Prohibition states:

> "Under 49 U.S.C. 46105(c), the Acting Administrator has determined that an emergency exists related to safety in air commerce. On March 13, 2019, the investigation of the ET302 crash developed new information from the wreckage concerning the aircraft's Start Printed Page 9706 configuration just after takeoff that, taken together with newly refined data from satellite-based tracking of the aircraft's flight path, indicates some similarities between the ET302 and JT610 accidents that warrant further investigation of the possibility of a shared cause for the two incidents that needs to be better understood and addressed.

> Accordingly, the ***Acting Administrator is ordering all Boeing 737 MAX airplanes to be grounded pending further investigation***."[15]

73. Boeing grounded all 737 MAX aircraft after the Ethiopian Airlines crash investigation revealed similarities with the Lion Air crash.

74. Boeing CEO Dennis Muilenburg released an open letter on March 20 that promised a software update to address the safety problems with the 737 MAX.

75. Boeing has yet to release the software update, which was initially to be released March 29, 2019.

76. For instance, the software update was delayed due to issues with integrating the software fix, but promised the update would come in the weeks following April 1, 2019.

77. Yet, on June 26, 2019, Boeing discovered additional flight-control problems involving failure of a microprocessor.[16]

78. The issues with releasing a fix are mounting, and a release date, if any, is uncertain.

### Response to Boeing's Failed 737 MAX

79. U.S. Congressional hearings have been held due to lawmakers' concerns regarding the 737 MAX's airworthiness and danger to the public.

80. In March 2019, U.S. lawmakers asked questions regarding the FAA's certification

---

[15] Notification of Emergency Order of Prohibition, 84 Fed. Reg. 9705-06 (March 13, 2019), https://www.federalregister.gov/documents/2019/03/18/2019-05067/operators-of-boeing-company-model-737-8-and-boeing-company-model-737-9-airplanes-emergency-order-of (emphasis added).

[16] Dominic Gates, Newly stringent FAA tests spur a fundamental software redesign of Boeing's 737 MAX flight controls, SEATTLE TIMES (Aug. 1, 2019), https://www.seattletimes.com/business/boeing-aerospace/newly-stringent-faa-tests-spur-a-fundamental-software-redesign-of-737-max-flight-controls/.

process for the 737 MAX, during which the acting head of the FAA said that Boeing should have disclosed information about the MCAS.

81.     The House Aviation Subcommittee also held hearings in May, June, October, and December 2019.

82.     In June 2019, Congress held an evidentiary hearing and heard from Chelsey Sullenberger, the pilot who saved a damaged aircraft by safely landing in the Hudson River in 2009, stated that he struggled in a 737 MAX simulator after the crashes and concluded that MCAS "was fatally flawed and should never have been approved."[17]

83.     In October 2019, Boeing CEO Dennis Muilenburg testified that he was aware in early 2019, prior to the second deadly crash of the 737 MAX, that a test pilot had raised questions about the safety of the aircraft. The test pilot sent text messages and emails, which date back to November 2016, that reflect Boeing's efforts to hide safety concerns from the FAA and other regulators.

84.     Mr. Muilenburg, in his Opening Statement to the House Committee on Transportation and Infrastructure on October 30, 2019,[18] stated:

    a.   "[W]e know that both accidents involved the repeated activation of a flight control software function called MCAS."

    b.   "Based on that information, we have developed robust software improvements that will, among other things, ensure MCAS cannot be

---

[17] David Schaper, Pilots Criticize Boeing, Saying 737 Max "should never have been approved", NPR (June 19, 2019), https://www.npr.org/2019/06/19/734248714/pilots-criticize-boeing-saying-737-max-should-never-have-been-approved.

[18] Opening Statement of Dennis Muilenburg, October 30, 2019, The Boeing 737 MAX: Examining the Design, Development, and Marketing of the Aircraft, https://transportation.house.gov/imo/media/doc/Muilenburg%20Testimony.pdf.

activated based on signals from a single sensor and cannot be activated repeatedly."

    c.   "[R]eturn-to-service timing is completely dependent on answering each and every question from the FAA."

    d.   "[O]ur airline customers and their pilots have told us they don't believe Boeing communicated enough about MCAS."

    e.   "[S]ubject to regulatory approval, additional and enhanced training and educational materials will be available for pilots who fly the MAX."

    f.   "We know we made mistakes and got some things wrong."

85.    In December 2019, Ed Pierson, a retired Boeing manager, testified that Boeing executives, its board and U.S. regulators ignored his warnings about the potential for production issues to affect the quality and safety of planes rolling off the lines. Mr. Pierson testified about how Boeing's efforts to up production led to a "chaotic" environment that negatively impacted safety. He stated: "It is alarming that these sensors failed on multiple flights mere months after the airplanes were manufactured." FAA chief Steve Dickson testified that he was aware of Mr. Pierson's concerns.[19]

86.    Representative Peter DeFazio, chairman of the House transportation committee said during the December 2019 hearings that the committee had "uncovered a broken safety culture within" Boeing. A retired FAA and Pentagon air-safety official stated that the projected 15 additional crashes "would be an unacceptable number in the modern aviation-safety world."[20]

---

[19] Doug Cameron and Andy Pasztor, FAA Probes Alleged Production Issues at Boeing Plant, THE WALL STREET JOURNAL (December 11, 2019), https://www.wsj.com/articles/faa-probes-alleged-production-issues-at-boeing-plant-11576103579.

[20] Andy Pasztor and Andrew Tangel, Internal FAA Review Saw High Risk of 737 MAX Crashes, THE WALL STREET JOURNAL (December 11, 2019),

87. Grand jury investigations are also being held on Boeing's design and certification of an un-airworthy aircraft.

88. The federal grand jury investigation is looking into the certification process that approved the safety of the Boeing 737 MAX. The U.S. Justice Departments is overseeing the investigation by the Department of Transportation Inspector General.

89. The FBI is also investigating the certification of the Boeing 737 MAX.

90. Following the Lion Air and Ethiopian Airlines crashes, the public has lost complete confidence in the safety of the 737 MAX.

91. Flyers say they will avoid the 737 MAX even if it is cleared for flight because they are now terrified of flying on it.[21]

92. In a press conference prior to the Paris Airshow in June, Boeing Chief Executive Officer Dennis Muilenburg stated that the company should have been more transparent with regulators and the public when Boeing discovered a safety light was not operating as designed. Boeing spokesman Gordon Johndroe further told NPR that "[w]e clearly fell short in the implementation of the AOA disagree alert and we clearly should have communicated better with our regulators and the airlines."[22]

---

https://www.wsj.com/articles/internal-faa-review-saw-high-risk-of-737-max-crashes-11576069202.

[21] Mary Schlangenstein, Many fliers say they will avoid Boeing's 737 Max even if it's cleared to fly, BLOOMBERG (June 4, 2019), https://www.bloomberg.com/news/articles/2019-06-04/boeing-737-max-seen-as-airplane-non-grata-by-wary-travelers; *see also* Anurag Kotoky and Kyunghee Park, Boeing's Grounded 737 Max – The Story So Far, THE WASHINGTON POST (July 16, 2019), https://www.washingtonpost.com/business/boeings-grounded-737-max-the-story-so-far/2019/07/15/d995e5da-a724-11e9-8733-48c87235f396_story.html.

[22] Daniella Cheslow, Boeing CEO Admits Mistake In 737 Max Communication, NPR (June 16, 2019), https://www.npr.org/2019/06/16/733215857/boeing-ceo-admits-mistake-in-737-max-communication.

93.     Boeing's inability to solve design defects in the 737 MAX has caused cancelled flights and kept aircraft grounded.

94.     Jon Weaks, who heads the Southwest Airlines Pilots Association (SWAPA), said in a note to pilots in November that "Boeing is increasingly publicizing that they may have to shut down their production line due to running out of room to store completed MAX aircraft. There is some concern that this is simply another tactic to push the [return to service] timeline up."[23] He continued: "Boeing will never, and should not ever, be given the benefit of the doubt again. The combination of arrogance, ignorance, and greed should and will haunt Boeing for eternity. I strongly concur with Southwest exploring obtaining a different and perhaps non-Boeing aircraft for the best interest of all our futures."[24]

95.     Even flight attendants have stated they will refuse to work on the 737 MAX when it is recertified by the FAA. Association of Professional Flight Attendants President Lori Bassani wrote in a October 30 letter to Boeing that "[t]he 28,000 flight attendants working for American Airlines refuse to walk onto a plane that may not be safe and are calling for the highest possible safety standards to avoid another tragedy."[25] Ms. Bassani has also stated: "I will tell you that I hear from flight attendants every day, and they're begging me not to make them go back up in [the 737

---

[23] Will Martin, The head of Southwest's pilots union says Boeing is trying to rush the 737 Max back into service out of 'arrogance', BUSINESS INSIDER (November 14, 2019), https://www.businessinsider.com/737-max-southwest-pilots-boss-boeing-forcing-plane-back-2019-11/amp/.

[24] Id.

[25] Tracy Rucinski, American Airlines flight attendants stand up to Boeing CEO on 737 MAX, REUTERS (October 31, 2019), https://www.reuters.com/article/us-boeing-737max-american-airline-unions/american-airlines-flight-attendants-stand-up-to-boeing-ceo-on-737-max-idUSKBN1XA2JO.

MAX] plane."[26]

96.    Air Force officials also lack confidence. Following the Lion Air crash, senior officials Air Force officials met with Boeing counterparts to confirm the KC-46A tanker's MCAS system is safe.[27]

97.    Jim Marko, the manager in aircraft integration and safety assessment at Transport Canada Civil Aviation, said in a November 19, 2019 email to officials at the FAA, the European Union Aviation Safety Agency and Brazil's National Civil Aviation Agency: "The only way I see moving forward at this point, is that MCAS has to go."[28] Mr. Marko noted that public confidence in the 737 MAX was "LOW" and that the purpose of his email was to "get some confidence back to us all that we as Authorities can sleep at night when that day comes when the MAX returns to service."[29]

98.    Linh Le, an FAA system safety engineer, circulated Mr. Marko's message around the FAA noting: "I have held similar perspective (questioning the need for MCAS, at least from the system safety standpoint)."[30]

---

[26] Will Martin, American Airlines flight attendants have literally begged not to work on the Boeing 737 Max when it returns, union boss says, BUSINESS INSIDER (November 15, 2019), https://www.businessinsider.com/boeing-737-max-american-airlines-staff-beg-avoid-plane-2019-11.

[27] Alison Sider and Andrew Tangel, Before 737 MAX, Boeing's Flight-Control System Included Key Safeguards, THE WALL STREET JOURNAL (Sept. 29, 2019), https://www.wsj.com/articles/before-737-max-boeings-flight-control-system-included-key-safeguards-11569754800.

[28] Natalie Kitroeff and David Gelles, Canadian Official Calls for Removal of Key Software From 737 Max, NY TIMES (November 22, 2019), https://www.nytimes.com/2019/11/22/business/boeing-canada-737-max.html.

[29] Id.

[30] Id.

99.     Thus, Boeing has completely lost public trust in the 737 MAX, which has rendered the aircraft worthless.

### Boeing Misrepresentations

100.    At the time that Boeing entered into the Purchase Agreement with Timaero:

a.    Boeing represented that the 737 MAX would be airworthy, safe, reliable, and fit for its intended purposes, which it is not;

b.    Boeing knew and/or should have known that the design of the 737 MAX was contrary to FAA regulatory standards, including the FAA Airworthiness Standards, including but not limited to 14 C.F.R. § 25.203(a) Stall Characteristics, which states "[i]t  must be possible to produce and to correct roll and yaw by unreversed use of the aileron and rudder controls, up to the time the airplane is stalled. No abnormal nose-up pitching may occur. The longitudinal control force must be positive up to and throughout the stall. In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls";

c.    Boeing knew and/or should have known that the MCAS could dangerously force the 737 MAX's nose down while trying to mitigate the risks of a potential stall of the aircraft, yet Boeing did not take any action to inform customers, pilots or aviation authorities of this hazard, which created a likelihood that the 737 MAX would crash and that aviation authorities would be forced to ground the aircraft;

d.    In order to market the 737 MAX as a model that would not require pilots to undergo expensive and time-consuming additional simulator training and/or testing to handle the emergencies, Boeing knowingly permitted an unsafe and deficient design of the aircraft, which permanently compromised the safety and reputation of the 737 MAX and misled

purchasers and potential purchasers, including but not limited to Timaero, about the nature and economics of the aircraft;

e.  In order to avoid an FAA requirement of additional pilot simulator training and emergency procedures testing, Boeing deliberately and knowingly failed to inform aviation authorities, pilots and potential 737 MAX purchasers, including but not limited to Timaero, of relevant and essential information about the MCAS features, which permanently compromised the economics and reputation of the aircraft;

f.  Boeing deliberately and knowingly failed to disclose to customers and potential customers, including but not limited to Timaero, to the FAA and other aviation authorities, or to pilots, the safety issues associated with the design of the 737 MAX, including but not limited to the potential failure of sensors, the notification system for inconsistent sensor readings, and the risks associated with the MCAS system, all of which compromised the safety, reputation and nature of the aircraft;

g.  Boeing knowingly failed to conduct a proper failure modes and effects analysis during the development of the 737 MAX in order to ensure that the MCAS was safe, resulting in an aircraft that is patently unsafe;

h.  Boeing knew and failed to disclose that the MCAS was defective and therefore dangerous[31];

i.  Boeing knew or should have known that MCAS' failure should have been categorized as catastrophic;

j.  Boeing knew or should have known that MCAS should not have relied on a single

---

[31] *See, e.g.*, the letter of Boeing's CEO Dennis Muilenburg dated April 4, 2019 (https://boeing.mediaroom.com/2019-04-04-Boeing-CEO-Dennis-Muilenburg-Addresses-the-Ethiopian-Airlines-Flight-302-Preliminary-Report).

angle of attack sensor;

k.    Boeing failed to disclose that MCAS could trigger multiple times; and

l.    Boeing repeatedly represented to the public, including but not limited to Timaero, that the 737 MAX was safe to operate, despite the fact that two 737 MAX had crashed in 2019, despite Boeing's awareness of the design flaws that caused the crashes, and despite the fact that Boeing was still working on a software fix to address the MCAS defects.

101.    However, Boeing did not design the 737 MAX according to its representations and failed to properly certify the aircraft for safe flight.

## CAUSES OF ACTION

### COUNT I
### (Fraudulent Inducement)

102.    Timaero realleges the allegations of all prior paragraph as if each is fully set forth herein.

103.    Boeing is the manufacturer, designer, distributor, seller and/or supplier of the 737 MAX model aircraft. While engaged in the course of business, Boeing made representations about material facts to Timaero regarding the character and/or quality of the 737 MAX to influence Timaero's decision to purchase that model aircraft.

104.    Boeing had a duty to disclose material information about the airworthiness of its aircraft to its customers, including Timaero. Boeing intentionally failed to disclose this material information for the purpose of inducing customers, including Timaero, to purchase Boeing's 737 MAX model aircrafts.

105.    Boeing made numerous representations that were knowingly false when made and

which were intended by Boeing to induce Timaero's reliance in proceeding with the terms of the purchase agreement.

106.    At the time Timaero entered into its agreement to purchase the 737 MAX aircraft, Boeing represented that the 737 MAX was an airworthy and safe aircraft, and that it had been designed in compliance with aviation regulations.

107.    However, Boeing made false representations to the FAA during the certification process of the aircraft. As detailed above, Boeing knowingly failed to inform the FAA of changes to the MCAS system and knowingly failed to conduct the appropriate testing and safety analysis regarding such changes. Boeing also falsely represented to the FAA that the MCAS system was benign and rarely used. As a result of Boeing's failures, the FAA made decisions regarding the flightworthiness of the 737 MAX, and the 737 MAX was able to receive the appropriate flight certifications from the FAA. Due to Boeing's actions and omissions of fact during certification, Boeing misrepresented to Timaero that the 737 MAX model aircraft was airworthy and safe to fly, and that it had been designed in compliance with aviation regulations, when in fact it was not.

108.    Furthermore, after the crash of Lion Air Flight 610, Boeing downplayed the MCAS' significant problems and failed to take adequate preventative measures. Boeing also failed to inform the public and customers, such as Timaero, of the danger MCAS presented. Boeing further failed to adequately disclose the significant differences between the 737 MAX and its predecessors, and the extent of the necessary corrective action.

109.    As a result, and in reliance on Boeing's misrepresentations regarding the airworthiness of the subject aircraft, Timaero continued to abide by the terms of the Purchase Agreement, which set forth advanced payments to be made, and which were made, by Timaero. Timaero was unable to make an informed decision regarding its business dealings and transactions

with Boeing, and has not been able to recover such advanced payments.

110.    At the time of this Complaint, Boeing was contractually obligated in accordance with the Purchase Agreement to deliver four (4) Boeing Model 737-8 Aircraft to Timaero. Boeing, however, has only delivered two (2) 737-8 Aircraft.

111.    Boeing's acts and conduct as averred herein have cause substantial, irrecoverable and irreparable consequential damages to Timaero's business reputation and goodwill, and have caused the resulting loss in the value of Timaero's business which is continuing and has constituted an ongoing concern for Timaero. At the time the Purchase Agreement was executed, Boeing knew or should have known that Timaero would sell or enter into leasing contracts with third parties for the subject aircraft. For example, in Letter Agreement VEB-PA04022-LA-1301891 to the Purchase Agreement, Boeing acknowledged that "[i]t is understood that Customer [Timaero] intends to lease the Aircraft to a third party or parties…and that such Lessees will be in the commercial airline business as an operator of aircraft." Timaero, however, has not been able to conduct its business as usual and lease or sell the subject undelivered aircraft due to Boeing's fraudulent inducement and breach. As a result, Timaero has lost substantial business and revenues.

112.    Further, Boeing has refused to refund Timaero its advanced payments to Boeing that were made in accordance with the terms of the Purchase Agreement.

113.    Boeing's affirmative misrepresentations and material omissions as set forth herein comprise fraudulent inducement and/or promissory fraud. These misrepresentations and omissions were significant and material and were intended to and did mislead Timaero. Timaero acted in reliance upon Boeing's misrepresentations and omissions and has suffered damages thereby. Timaero claims all damages to which it is entitled under applicable law and in an amount to be determined at trial.

*COUNT II*
**(Breach of Contract)**

114.    Timaero realleges the allegations of all prior paragraph as if each is fully set forth herein.

115.    Boeing and Timaero are parties to Purchase Agreement Number PA-04022 relating to Boeing Models 737-8 Aircraft and Aircraft General Terms Agreement dated January 10, 2014, which was identified as VEB-AGTA ("AGTA"), which incorporate letter agreements, tables, exhibits, and supplemental agreements.

116.    Boeing breached the Purchase Agreement and AGTA, including by (a) failing to comply with regulatory requirements and certificates, and (b) by delaying the scheduled delivery of aircraft due to Boeing's fault or negligence.

117.    Article 3 of the AGTA pertains to Regulatory Requirements and Certificates that must be obtained by Boeing and specifically provides in Section 3.1 as follows:

> 3.1 Certificates. Boeing will manufacture each aircraft to conform to the appropriate Type Certificate issued by the United States Federal Aviation Administration (FAA) for the specific model of aircraft and will obtain from the FAA and furnish to Customer at delivery of each aircraft either a Standard Airworthiness Certificate or an Export Certificate of Airworthiness issued pursuant to Part 21 of the Federal Aviation Regulations.

118.    Boeing breached the terms of the AGTA in not designing and manufacturing the 737 MAX in accordance with FAA regulations, and all other pertinent United States federal aviation regulations, pertaining to type certificates that must be obtained for the design and manufacture of new model aircraft.

119.    Article 7 of the AGTA titled "Excusable Delay" specifically provides in Section 7.1 as follows:

> 7.1 <u>General</u>. Boeing will not be liable for any delay in the scheduled delivery month of an aircraft or other performance under a purchase agreement caused by

(i) acts of God; (ii) war or armed hostilities; (iii) government acts or priorities; (iv) fires, floods, or earthquakes; (v) strikes or labor troubles causing cessation, slowdown, or interruption of work; (vi) inability, after due and timely diligence, to procure materials, systems, accessories, equipment or parts; or (vii) any other cause to the extent such cause is beyond Boeing's control and not occasioned by Boeing's fault or negligence. A delay resulting from any such cause is defined as an Excusable Delay.

120.    As set forth in Section 7.1, all of the causes considered Excusable Delay are those that are "beyond Boeing's control and not occasioned by Boeing's fault or negligence."

121.    Boeing's delay in the delivery of aircraft to Timaero in breach of the aircraft delivery schedule agreed to by the parties is the result of Boeing's fault and negligence in designing the aircraft with a defective flight control system that it did not properly test and analyze, and for which it provided incorrect and incomplete analysis to the FAA as part of its certification.

122.    At the time of this Complaint, Boeing was contractually obligated in accordance with the Purchase Agreement to deliver four (4) Boeing Model 737-8 Aircraft to Timaero. Boeing, however, has only delivered two (2) 737-8 Aircraft.

123.    Boeing's acts and conduct as averred herein have cause substantial, irrecoverable and irreparable consequential damages to Timaero's business reputation and goodwill, and have caused the resulting loss in the value of Timaero's business which is continuing and has constituted an ongoing concern for Timaero. At the time the Purchase Agreement was executed, Boeing knew or should have known that Timaero would sell or enter into leasing contracts with third parties for the subject aircraft. For example, in Letter Agreement VEB-PA04022-LA-1301891 to the Purchase Agreement, Boeing acknowledged that "[i]t is understood that Customer [Timaero] intends to lease the Aircraft to a third party or parties…and that such Lessees will be in the commercial airline business as an operator of aircraft." Timaero, however, has not been able to conduct its business as usual and lease or sell the subject undelivered aircraft due to Boeing's fraudulent inducement and breach. As a result, Timaero has lost substantial business and revenues.

124.     Further, Timaero has not been able to recover its advanced payments to Boeing for the subject aircraft that were made in accordance with the terms of the Purchase Agreement.

125.     Timaero has suffered damages as a result of Boeing's breach and claims all damages to which it is entitled under applicable law and in an amount to be determined at trial.

### COUNT III
### (Breach of the Duty of Good Faith and Fair Dealing)

126.     Timaero realleges the allegations of all prior paragraph as if each is fully set forth herein.

127.     Contracts contain an implied covenant of good faith and fair dealing under Washington law. Where one party to the contract deliberately contravenes the intention and spirit of the contract, that party is liable for breach of the implied covenant of good faith and fair dealing.

128.     Boeing's actions and/or omissions as set forth herein are in breach of the Purchase Agreement's implied covenant of good faith and fair dealing. Boeing's acts and/or omissions regarding the airworthiness of the 737 MAX were contrary to the standards of good faith and fair dealing, and were made in such a manner as to evade the spirit of the Purchase Agreement, and/or so as to deny Timaero the expected benefits of the transaction.

129.     At the time of this Complaint, Boeing was contractually obligated in accordance with the Purchase Agreement to deliver four (4) Boeing Model 737-8 Aircraft to Timaero. Boeing, however, has only delivered two (2) 737-8 Aircraft.

130.     Boeing's acts and conduct as averred herein have cause substantial, irrecoverable and irreparable consequential damages to Timaero's business reputation and goodwill, and have caused the resulting loss in the value of Timaero's business which is continuing and has constituted an ongoing concern for Timaero. At the time the Purchase Agreement was executed, Boeing knew or should have known that Timaero would sell or enter into leasing contracts with third parties for

29

the subject aircraft. For example, in Letter Agreement VEB-PA04022-LA-1301891 to the Purchase Agreement, Boeing acknowledged that "[i]t is understood that Customer [Timaero] intends to lease the Aircraft to a third party or parties…and that such Lessees will be in the commercial airline business as an operator of aircraft." Timaero, however, has not been able to conduct its business as usual and lease or sell the subject undelivered aircraft due to Boeing's fraudulent inducement and breach. As a result, Timaero has lost substantial business and revenues.

131.     Further, Timaero has not been able to recover its advanced payments to Boeing for the subject aircraft that were made in accordance with the terms of the Purchase Agreement.

132.     Boeing's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, damage to Timaero, in an amount to be proved at trial.

*COUNT IV*
**(Tortious Interference with a Business Expectancy)**

133.     Timaero realleges the allegations of all prior paragraph as if each is fully set forth herein.

134.     Timaero possessed valid business expectancies that it would sell or lease 737 MAX aircraft to its customers.

135.     Boeing knew or should have known that Timaero planned to lease and sell the 737 MAX planes.

136.     Boeing's failure to disclose material information about the airworthiness combined with the grounding of all 737 MAXs caused a breach in the expectancy that Timaero could sell or lease 737 MAXs to Timaero customers.

137.     Boeing knew, or should have known, that its failure to disclose material information about the airworthiness was substantially certain to cause an interference between Timaero and Timaero's customers.

138.    Boeing was motivated by an improper purpose to interfere with Timaero's business expectancies because Boeing was motivated by considerations outside of the scope of its obligations, including greed, failing to act fairly and reasonably in dealing with Timaero, and failing to adhere to standards of the trade or profession.

139.    Boeings interference is wrongful by reason of statute, established common law, the understandings and business relationship between the parties, the standards of business morality and care, and the standards of the trade or profession.

140.    As a result of this tortious interference, Timaero has been and will continue to be injured in its business and has been prevented from carrying out its advantageous and prospective business with customers.

141.    As a direct and proximate result of Boeing's tortious conduct, Timaero has been damaged and continues to be damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Timaero prays the entry of a money judgment against Boeing in excess of the jurisdictional limit in an amount as a jury deems reasonable and just, together with costs, attorneys' fees, and such other damages as may be allowed under applicable law. Timaero further demands a trial by jury of all issues triable as of right by a jury.

Timaero requests the following relief:

A.  an order directing the rescission of the Purchase Agreement Number PA-04022;

B.  an order directing Purchase Agreement Number PA-04022 between Boeing and Timaero be cancelled and set aside;

C.  an award for damages to compensate Timaero for damages proximately caused by Boeing's wrongful acts and omissions as alleged herein in excess of $185,000,000;

D.  an award for damages to compensate Timaero for its lost profits caused by Boeing's wrongful acts and omissions as alleged herein in an amount to be determined at trial;

E.  an award of punitive damages for Boeing's fraudulent acts in an amount at least three
    times the amount of compensatory damages;

F.  recovery of Timaero's costs incurred in bringing this action, including attorneys' fees,
    to the extent authorized by law;

G.  any other damages recoverable under applicable law; and

H.  such other relief as the Court deems just and equitable under applicable law.

**JURY DEMAND**

Timaero hereby demands a trial by jury on all claims triable to a jury.

Dated: December 17, 2019                    Respectfully submitted,

                                            */s/ Patrick F. Solon*
                                            Patrick F. Solon
                                            Gretchen L. Schmidt
                                            Vitale, Vickrey, Niro, Solon & Gasey LLP
                                            311 S. Wacker Dr., Ste. 2470
                                            Chicago, IL 60606
                                            Telephone: 312-236-0733
                                            Facsimile: 312-236-3137
                                            Email: solon@vvnlaw.com
                                                     schmidt@vvnlaw.com

                                            Wesley W. Whitmyer, Jr. (*pro hac vice pending*)
                                            Michael J. Kosma (*pro hac vice pending*)
                                            Christopher J. Stankus (*pro hac vice pending*)
                                            Robert D. Keeler (*pro hac vice pending*)
                                            WHITMYER IP GROUP LLC
                                            600 Summer Street
                                            Stamford, Connecticut 06901
                                            Telephone: (203) 703-0800
                                            Facsimile: (203) 703-0801
                                            Email: litigation@whipgroup.com
                                                     mkosma@whipgroup.com
                                                     cstankus@whipgroup.com
                                                     rkeeler@whipgroup.com

                                            *Attorneys for Plaintiff,*
                                            *Timaero Ireland Limited*

32