**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TIMAERO IRELAND LIMITED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 19 C 8234** |
| | ) | |
| **THE BOEING COMPANY,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Timaero Ireland Limited ("Timaero") is an Ireland-based company that buys aircraft from manufacturers and sells or leases them to airlines or other intermediaries. Beginning in 2014, Timaero entered into a series of contracts with Defendant The Boeing Company ("Boeing") to purchase 22 Boeing Model 737-8 aircraft, also known as the 737 MAX. Timaero had received just two of these 22 airplanes when two 737 MAX aircraft crashed within months of one another, killing more than 300 passengers and leading regulatory agencies around the globe to ground all 737 MAX aircraft indefinitely. In the wake of these events, Timaero sued Boeing for fraud, breach of contract, and breach of the implied duty of good faith and fair dealing. Timaero filed the case in this district, where Boeing's corporate headquarters are located. Boeing has moved, under 28 U.S.C. § 1404(a), to transfer venue to the Western District of Washington—the location of Boeing's commercial aircraft division and most of its aircraft manufacturing facilities. Boeing also moves to dismiss Timaero's claims for fraudulent concealment, fraudulent inducement, or breach of the duty of good faith and fair dealing. For the following reasons, the motion to dismiss is granted. Timaero's breach of contract claim survives this ruling, and Timaero will have leave to file an amended complaint to cure deficiencies identified here. The court also grants Boeing's motion to transfer venue to the Western District of Washington.

## BACKGROUND

The court summarizes the fact alleged in Timaero's First Amended Complaint: In 2013, representatives from Timaero and Boeing met in Le Bourget, France, where Timaero signed a letter of intent to purchase twenty 737 MAX aircraft from Boeing for some two billion dollars.  (Am. Compl. [42] ¶ 37.)  Thereafter, employees from the two companies met in Moscow, Russia and Muscat, Oman, for the purpose of continuing to both market the 737 MAX to Timaero and negotiate the terms of a contract for Timaero's purchase of 737 MAX aircraft ("Purchase Agreement").  (*Id.* ¶¶ 39–41.)  In these marketing, sales, and negotiation meetings, Boeing employees represented to Timaero that the 737 MAX would have the following features:

> [T]he 737 MAX would have class-leading fuel efficiency, would not require additional simulator training for pilots already certified to fly its predecessor 737 NG . . . would be easily saleable and leasable, a good value for Timaero, and would be airworthy, safe, free from design defects, and in compliance with appropriate aviation regulations.

(*Id.* ¶ 41.)  Boeing made similar representations to other customers.  (*Id.* ¶¶ 48–50.)

On January 10, 2014, the companies entered into a Purchase Agreement in which Timaero committed to purchasing twenty 737 MAX aircraft from Boeing.  (*Id.* ¶ 11.)  Between March 22 and March 29, 2014, representatives from Timaero met with Boeing employees in Seattle, Washington, where Boeing employees continued to represent that the 737 MAX aircraft would have the features described above.  (*Id.* ¶ 47.)  On September 15, 2016, the two companies entered into a Supplemental Agreement in which Timaero converted a prior order for two 737-800 aircraft, to an order for two additional 737 MAX airplanes—increasing Timaero's purchase to a total of 22 of the 737 MAX airplanes.  (*Id.* ¶ 175.)

Nearly two dozen of the Boeing employees who participated in marketing, sales, and contracting activities with Timaero currently reside in the state of Washington.  (*See generally* First Decaro Decl., Ex. 1 to Def.'s Mot. to Transfer [33-1] (hereinafter "First Decaro Decl."); Second Decaro Decl., Ex. 1 to Def.'s Reply to Mot. to Transfer [57-1] (hereinafter "Second Decaro Decl.").)  While many of those individuals continue to work for Boeing (First Decaro Decl. ¶¶ 9, 19, 21;

Second Decaro Decl. ¶¶ 5, 6, 9, 10, 12, 14, 15, 18), others no longer do. (First Decaro Decl. ¶¶ 7, 16, 20, 22; Second Decaro Decl. ¶¶ 7, 8, 13, 16, 19.)

The 737 MAX was short-lived. Over a period of four and a half months in 2018 and 2019, there were two major crashes of commercial 737 MAX aircraft, resulting in the deaths of more than 300 individuals. (Am. Compl. ¶¶ 105–06.) Following the second crash, countries worldwide grounded all 737 MAX aircraft indefinitely. (*Id.* ¶ 126.) According to press reports, the FAA recertified the 737 MAX on November 18, 2020—a year and a half after the MAX was grounded. Tom Costello & Ben Popken, *FAA Clears Boeing 737 Max to fly again*, NBC News (Nov. 18, 2020 7:00AM CST), https://www.nbcnews.com/business/business-news/faa-clears-boeing-737-max-fly-again-n1248090 (last visited Mar. 12, 2021).

Following the crashes, investigations revealed that the fallen airplanes had experienced mechanical failures, arising out of a newly implemented software called the Maneuvering Characteristics Augmentation System ("MCAS"). The purpose of the MCAS was to automatically stabilize a 737 MAX airplane, without pilot input, if the plane unexpectedly started pitching upward. (Am. Compl. ¶¶ 55, 111.) Instead, the MCAS overreacted, unnecessarily forcing the plane's nose toward the ground. In each case, the pilot—who was not even aware of the MCAS software— tried to manually stabilize the plane but was thwarted when the automated MCAS repeatedly triggered, continuing to force the plane's nose downward until the plane crashed. (*Id.* ¶ 111.)

Timaero asserts that the roots of the MCAS problem can be traced to Boeing's initial decision to begin designing the 737 MAX. In August 2011, Boeing's Board of Directors worried that the company would soon lose substantial market share to its biggest competitor, Airbus, who was in the process of designing a new commercial aircraft—the A320neo. (*Id.* ¶¶ 22–24.) Instead of designing an entirely new model of aircraft, Boeing's board decided to save time and money by simply creating a new iteration in the 737 line of airplanes: the 737 MAX. (*Id.* ¶¶ 23–24.) As an added benefit, Boeing hoped to save its customers millions of dollars by convincing the FAA

to certify the 737 MAX without requiring pilots of existing 737 models to undergo any additional flight simulator training. (*Id.* ¶ 48.)

Boeing began the design process by placing larger, fuel-efficient engines on the existing 737 frame. (*Id.* ¶ 51.) These larger engines, however, changed the plane's aerodynamics, leading it to unexpectedly pitch upward during test flights. (*Id.* ¶¶ 51–52.) To address this problem, Boeing implemented the MCAS, a system in which two automated "angle-of-attack" sensors ("AOA sensors") would activate if a plane began unnecessarily pitching upward. The AOA sensors would then notify the MCAS software, which would automatically force the plane's nose down until the body of the plane was properly parallel to the ground. (*Id.* ¶¶ 55, 58.) At first, Boeing notified the FAA of this plan—assuring them that the MCAS system was "benign and rarely used." (*Id.* ¶ 69.) With this information, the FAA approved the limited use of the MCAS system without requiring additional pilot simulator training. (*Id.* ¶¶ 64, 69–70.) Instead, the FAA required just one hour of iPad-based training on the differences between the 737 MAX and the older 737 models, failing entirely to mention the MCAS system. (*Id.* ¶ 70.)

By 2016, test flights revealed that the aerodynamics problems were more widespread than previously anticipated. (*Id.* ¶ 61.) To combat these broader issues, Boeing not only expanded the automatic features of the MCAS software, but also eliminated the need for input from a second AOA sensor that had previously acted as a failsafe in case the first AOA sensor were to malfunction. (*Id.* ¶¶ 62–65.) Plaintiff alleges that Boeing did not inform the FAA or its customers of these changes and that Boeing knew that disclosing the changed capabilities of the MCAS system would likely jeopardize FAA approval of the airplanes without the requirement of additional simulator training. (*Id.* ¶¶ 94, 171.)

The delivery schedule set forth in the Purchase Agreement called for Boeing to have delivered five of the twenty-two 737 MAX aircraft as of the time of filing of this suit. (*Id.* ¶ 177.) Instead, Boeing has delivered only two and has refused to return any portion of the $189,224,800 deposit Timaero had already paid to Boeing. (*Id.* ¶¶ 9, 177.)

4

Timaero filed this case against Boeing on December 17, 2019 [1] alleging fraud, breach of contract, and breach of duty of good faith and fair dealing.[1]  In support of its breach of contract claim, Timaero alleges that Boeing breached its obligations to Timaero by "failing to comply with regulatory requirements and certificates" and by "delaying the scheduled delivery of aircraft due to Boeing's fault or negligence."  (Am. Compl. ¶ 185.)  In support of its fraud claim, Timaero alleges that Boeing's senior management pressured employees to release the 737 MAX in time to compete with the Airbus 320neo, and by so doing, fueled decisions to cut corners and ignore red flags in the process of designing and implementing the flawed MCAS system.  (Id. ¶¶ 31, 50, 140, 158.)  Timaero also alleged that Boeing executives and board members ignored warnings about potential 737 MAX production issues.  (Id. ¶ 140.)  According to Timaero, Boeing did not disclose any of this information during the contracting process.  (Id. ¶¶ 160, 172.)

On February 6, 2020, Boeing filed a motion to transfer venue of this action under 28 U.S.C. § 1404(a).  (Def.'s Mot. to Transfer [33].)  Boeing asks the court to transfer this case to the Western District of Washington—the location of Boeing's aircraft manufacturing facilities and the offices of Boeing's Commercial Airplanes division ("BCA").  Boeing argues that, while Boeing's corporate headquarters are in the Northern District of Illinois, the BCA division "is responsible for overseeing the design, engineering, regulatory certification, marketing, sales, assembly, and delivery of the 737 MAX airplane."  (Def.'s Mot. to Transfer at 1.)  On the same day that Boeing filed its motion to transfer venue, Boeing also filed its first motion to dismiss.  (Def.'s First Mot. to Dismiss [30].)  In response to this motion, Timaero filed an Amended Complaint, again alleging claims of fraud (both fraudulent inducement and fraudulent concealment), breach of contract, and breach of the implied duty of good faith and fair dealing.[2]  (Am. Compl. ¶¶ 165–198.)  On June

---

[1]    Timaero had also alleged tortious interference with business expectancy in its original complaint (Compl. ¶¶ 133–141), but it excluded that claim from its Amended Complaint.

[2]    While the Amended Complaint does not list "good faith and fair dealing" claim as a separate count, it includes the claim in two paragraphs under the breach of contract claim.  (Am. Compl. ¶¶ 192–193.)

25, 2020, Boeing asked the court to dismiss all of Timaero's claims other than breach of contract. (Def.'s MTD [61].)  As explained below, the court grants Boeing's motion to dismiss in its entirety as well as Boeing's motion to transfer this case to the Western District of Washington.[3]

<u>**DISCUSSION**</u>

**A.    Motion to dismiss**

When deciding a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff.  *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018).  Ordinarily, a plaintiff need only plead "enough facts to state a claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); FED. R. CIV. P. 8(a).  But "[h]eightened pleading requirements apply to complaints alleging fraud."  *Cornielson v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019).  Under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with particularity the circumstances constituting [that] fraud."  Boeing argues that this court should dismiss Timaero's fraudulent inducement and fraudulent concealment claims for failing to fulfill both Rule 9(b)'s heightened particularity requirement and Rule 8(a)'s more lenient plausibility requirement.  The court agrees that Timaero's allegations are insufficient to state fraud claims and dismisses those claims without prejudice.  .

**1.    Fraudulent inducement**

The parties agree that Illinois state law applies to Timaero's fraud claims.  (Def.'s MTD at 5 n.3; Pl.'s MTD Opp'n [68] at 5.)  Under Illinois law, a well-pleaded claim of fraudulent inducement must include allegations supporting the following elements:

---

[3]      Each party has asked the court to take judicial notice of the existence of certain public documents.  (Def.'s MTD Reply [69] at 10 n.3; Pl.'s Mot. for Judicial Notice [70].)  The court grants both requests.  *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of . . . documents contained in the public record, and reports of administrative bodies is proper.").  Neither set of documents, however, substantially affects the court's analysis here.

(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.

*Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018). Boeing argues that Timaero's fraudulent inducement claim fails to plausibly allege that Boeing made a false statement of material fact. (Def.'s MTD at 9.) The court agrees.

### i. Boeing's statements to Timaero

Timaero alleges that Boeing made the following false statements of material fact: (1) "the 737 MAX would have class-leading fuel efficiency," (2) it "would not require additional simulator training," (3) it would be "easily saleable and leasable" and "a good value for Timaero," (4) it "would be airworthy, safe, [and] free from design defects," and (5) it would be "in compliance with appropriate aviation regulations." (Pl.'s MTD Opp'n at 4 (citing Am. Compl. ¶¶ 7, 168).)

Two of these alleged statements immediately fall short. Although Timaero repeatedly references Boeing's promise that the 737 MAX would have class-leading fuel efficiency, nowhere does Timaero allege that the 737 MAX is not, indeed, so fuel efficient. To the contrary, Timaero acknowledges that the 737 MAX design came equipped with new engines that were more fuel-efficient then those of previous 737 designs. (Am. Compl. ¶ 51.) Boeing's promise of class-leading fuel efficiency is not a false statement of material fact.

Boeing's promises that the 737 MAX would be "easily saleable and leasable" and "a good value for Timaero" are also not actionable. These appear to be relatively "meaningless superlatives" that Illinois courts typically classify as mere puffery. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 173–74, 835 N.E.2d 801, 846 (2005) (internal citations omitted). In *Avery*, the Illinois Supreme Court labelled, as mere puffery, assurances that car parts were "[q]uality replacement parts" with "very high performance criteria." 216 Ill.2d at 175, 835 N.E.2d at 847. Similarly here, Boeing's promises that the 737 MAX would be "easily saleable and

leasable" and "a good value for Timaero" are general assurances of quality rather than specific representations of fact.

The analysis for the remaining three statements is more complicated. Different legal standards apply depending on when Boeing made these statements. First, Timaero argues that any statements made *after* Boeing had begun producing the 737 MAX would be analyzed as statements about "a machine of known physical characteristics," and thus "must be considered representations of existing fact." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 388–89, 618 N.E.2d 459, 464 (1st Dist. 1993). Significantly, however, Timaero has not alleged that Boeing directed any fraudulent statements at Timaero any time after 737 MAX production began. According to Timaero's brief, Boeing most recently directed a fraudulent statement at Timaero in March 2014. (Pl.'s MTD Opp'n at 4–5 (citing Am. Compl. ¶¶ 34–48).) Other allegations reflect that the FAA was still reviewing the 737 MAX for certification as late as 2016. (*See* Am. Compl. ¶¶ 83, 97.) This means that all of Boeing's allegedly fraudulent statements were promises about a future machine rather than descriptions of an existing machine of known characteristics. Such promises about future machines are not similarly considered representations of material fact. *See Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1364–66 (N.D. Ill. 1996) (holding the *Murphy-Knight* rule does not apply where statements concerned "future performance . . . of a machine that . . . was not yet built").

Instead, any false statement that Boeing made *before* actually producing 737 MAX planes falls under the domain of promissory fraud. *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (defining promissory fraud in Illinois as "involving a false statement of intent regarding future conduct . . . . "). In Illinois, a plaintiff claiming promissory fraud must plead two elements. First, the plaintiff must allege that "when the promise was made, the promisor had no intent to fulfill it." *Id.*; *accord Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (holding an unkept promise alone "is insufficient to make out a claim of promissory fraud, since there is no proof that the defendants made the promise never intending to keep it"). Second,

8

the plaintiff must allege that the fraudulent statements were "part of a scheme to defraud." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011). Generally, "the burden on a plaintiff claiming promissory fraud is deliberately high." *Bower*, 978 F.2d at 1012. For "[i]f the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed." *Id.* (internal quotations omitted).

Illinois courts have found "as few as two broken promises enough to establish a scheme to defraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012) (collecting cases). Timaero has alleged well more than two. According to Timaero's allegations, during the first nine months of communications between the two companies, Boeing made untrue representations fourteen different times to Timaero alone (Pl.'s MTD Opp'n at 4–5 (citing Am. Compl. ¶¶ 34–48)), not to mention the related representations Boeing made to its other customers and the FAA. (Am. Compl. ¶¶ 48–50.)

Yet Timaero has not fulfilled the first element of promissory fraud: that Boeing had no intention of fulfilling its promises at the time of their making. Timaero contends that Boeing never intended to fulfill its promises that (1) the 737 MAX would gain FAA approval without requiring additional simulator training, (2) the 737 MAX would be airworthy, safe, and free from design defects, and (3) the 737 MAX would be in compliance with appropriate aviation regulations. But the account set forth in Timaero's lengthy complaint also suggests that Boeing had no reason to believe these promises to be false until the 737 MAX began experiencing a second round of issues with the MCAS system in 2016. Timaero itself admits that, "For the 737 MAX, MCAS was originally designed with significant safety features and fail-safes." (*Id.* ¶ 58.) Timaero alleges, too, that the FAA was actually aware of the function of the original MCAS design and approved Boeing's position that no simulator training was required based on that version of the system. (*Id.* ¶¶ 69, 91.) Nothing about Timaero's allegations supports the conclusion that Boeing knew its promises were false until the time that Boeing changed the MCAS by "remov[ing] the two AOA

sensor design," "secretly expand[ing]" the functions of the system, and removing references to the MCAS to avoid further pilot training. (*Id.* ¶ 59.) And according to Timaero, Boeing only decided to implement these changes after test flights in 2016 revealed that the original version of the MCAS was ineffective.[4] (*Id.* ¶¶ 61–62.) Timaero's allegations, then, are inconsistent with the idea that Boeing intended to break its promises to Timaero when it made them in 2013 and 2014. *See Bower*, 978 F.2d at 1012 ("A change of mind can be a breach of contract . . . but it is not fraud." (internal quotations omitted)).

Timaero has failed to allege that Boeing made any false statements of material fact to Timaero either before or after the 737 MAX had entered the production process.

### ii. Boeing's statements to the FAA

Timaero also cannot ground fraud claims on any false statement that Boeing may have communicated to the FAA rather than to Timaero. "It is true that under Illinois law, false representations need not be made directly to the party claiming to have relied on them . . . . " *Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 853 (N.D. Ill. 2010). In particular, indirect representations constitute fraud "where a party makes false representations to another with the *intent or knowledge* that they be exhibited or repeated to [the plaintiff] for the purpose of deceiving [her] . . . . " *St. Joseph Hosp. v. Corbetta Constr. Co., Inc.*, 21 Ill. App. 3d 925, 955, 316 N.E.2d 51, 72 (1st Dist. 1974) (emphasis added). But Illinois courts have been clear that a plaintiff claiming indirect deception must allege that they "saw, heard or read" or were otherwise "induced" by the particular misrepresentations in question. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 140, 776 N.E.2d 151, 155 (2002). Certainly, "there is no authority to support [the] theory that

---

[4]    There is some question as to the exact date which Timaero alleges that Boeing decided to change the MCAS without telling the FAA. In Paragraph 61, the Amended Complaint suggests that Boeing decided to change the MCAS based on problems with test flights in 2016. But in Paragraphs 64 and 171, Timaero alleges that "by at least August 2017" Boeing planned to purposely misrepresent the functionality of the MCAS to the FAA. In either case, Timaero cannot claim that Boeing intended to eventually mislead the FAA when it originally made these promises to Timaero back in 2013 and 2014.

a plaintiff could rely on a misrepresentation that it never knew about." *Indep. Tr. Corp. v. Fid. Nat. Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1038 (N.D. Ill. 2008).

Timaero does not claim to have seen, heard, or read any of the misrepresentations that Boeing made to the FAA. Nor does Timaero claim to have even *been aware of* those misrepresentations, let alone deceived by them. Instead, Timaero argues that it should be able to recover for Boeing's fraudulent statements to the FAA because "Timaero would not have purchased or accepted delivery on uncertified aircraft, or aircraft that was fraudulently certified." (Pl.'s MTD Opp'n at 10.) But without arguing that Boeing's statements to the FAA actually reached Timaero, Timaero cannot succeed on an indirect deception theory under Illinois law. *De Bouse v. Bayer*, 235 Ill.2d 544, 554, 922 N.E.2d 309, 316 (2009) ("If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement . . . . ").

Timaero believes that by defrauding the regulatory agency, Boeing effectively defrauded its customers, including Timaero. The plaintiffs in *Buckman Co. v. Pl.s' Legal Comm.*, 531 U.S. 341 (2001), made a similar argument. In that case, orthopedic patients who had suffered injuries from a defective surgical screw approved by the Food and Drug Administration brought state-law fraud claims against the defendant manufacturer of those screws. The plaintiffs claimed the defendant had "made fraudulent representations to the Food and Drug Administration . . . in the course of obtaining approval to market the screws." *Id.* at 343. These fraudulent representations formed the basis for the FDA's decision to approve the screws which the plaintiffs ultimately relied on. *Id.*

The Court rejected this "fraud on the agency" theory for a number of reasons. First, the Court observed that "State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350. The Court also recognized that "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes [would] dramatically increase the burdens facing potential applicants—[imposing] burdens not contemplated by Congress in enacting the [FDA's parent

statutes]." *Id.* Furthermore, the Court worried that "fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, [would] later be judged insufficient in state court," thus incentivizing applicants to submit "a deluge of information that the Administration neither wants nor needs," unnecessarily burdening the agency. *Id.* at 351. These same concerns militate against Timaero's reliance on statements to the FAA in support of a claim of fraud.[5]

In opposition, Timaero cites *Learjet Corp. v. Spenlinhauer*, 901 F.2d 198 (1st Cir. 1990). There, the First Circuit reversed dismissal of fraud allegations under Kansas law where the plaintiff relied only indirectly on the defendant's statements to the FAA. *Id.* at 200, 203–04. As *Learjet* predates *Buckman*, it may not remain good law. More importantly, the First Circuit in *Learjet* was interpreting Kansas fraud law which, unlike Illinois fraud law, "do[es] not limit liability for fraudulent misrepresentations to situations in which the party making the fraudulent misrepresentation intended that the misrepresentation be communicated to the plaintiff." *Learjet Corp.*, 901 F.2d at 202. In other words, under Illinois law, Timaero must allege that Boeing made false statements to the FAA with the intention that Timaero would make decisions based on those particular statements. The Kansas fraud law in *Learjet* had no such requirement. For these reasons, Timaero cannot ground its fraud claims in any of Boeing's statements to the FAA.

Ultimately, Timaero's fraudulent inducement claim fails to identify a false statement of material fact made to Timaero. The court grants Boeing's motion to dismiss this claim.[6]

---

[5]     In *Buckman*, the Supreme Court held that state-law fraud-on-the-FDA claims are impliedly preempted by federal law. 531 U.S. at 353. While it is not clear whether state-law fraud-on-the-FAA claims are similarly preempted, this court need not reach that question today.

[6]     Although both parties devoted considerable space in their briefs to arguing the other elements of these claims (i.e., knowledge, intent, reliance, and damages), the court need not address these arguments given Timaero's failure to identify a false statement of material fact.

### 2.      Fraudulent concealment

Timaero also claims that Boeing is liable for fraudulent concealment.  In Illinois, fraudulent concealment "requires a plaintiff to 'allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.'"  *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 500, 675 N.E.2d 584, 593 (1996)).  Such a duty to disclose arises only under limited circumstances.

### i.      Existence of a special trust relationship

First, Timaero asserts that Boeing and Timaero developed a "special trust relationship." *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 738 (7th Cir. 2017).  A duty to disclose arises "where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff."  *Squires-Cannon*, 897 F.3d at 805 (internal quotations omitted).  But "[t]he special relationship threshold is a high one."  *Wigod*, 673 F.3d at 572.  Notably, "state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one."  *Id.* at 571.  And "asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship."  *Id.* at 573. Timaero and Boeing were contracting parties.  Timaero has not alleged a fiduciary relationship between Timaero and Boeing; nor has Timaero provided any reason, other than sheer information asymmetry, to believe a special trust relationship exists.  (Pl.'s MTD Opp'n at 14.)  This is insufficient.

### ii.      Duty to disclose half-truths

A duty to disclose can also arise where "the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'"  *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009).  Here, Timaero argues that Boeing's statements surrounding the certification of the 737 MAX qualified as such half-truths.  (Pl.'s MTD Opp'n at 14.)  While Boeing did get the 737 MAX certified without

13

requiring simulator training, Timaero alleges that Boeing did so only by hiding material information from the FAA. (Am. Compl. ¶¶ 59–70.) The court is sympathetic to this argument. Surely Timaero had a dual interest in FAA approval: (1) an interest in the "rubber stamp" that would allow Timaero's customers to fly these planes without requiring pilots to undergo additional simulator training, and (2) an interest in "safety assurance" that would reassure Timaero and other customers that the 737 MAX airplanes were fit for sale without risk of impending harm or liability. By hiding material information from the FAA, Timaero contends, Boeing was able to deliver an FAA approval that appeared to convey both the "rubber stamp" and "safety assurance" features but instead offered nothing more than the FAA's permission (improvidently granted, Timaero contends) to fly the airplanes without requiring additional simulator training—and no real safety assurance.

But Timaero's argument that Boeing communicated a half-truth fails for other reasons. Under Illinois law, fraudulent concealment claims still must "meet[ ] the elements of fraudulent misrepresentation . . . ." *Wigod*, 673 F.3d at 571. One such element is fraudulent intent. *Newman*, 885 F.3d at 1003. In Illinois, "a party can satisfy the fraudulent intent element by proving that a misrepresentation [or half-truth] was made knowingly or with reckless disregard for its truth or falsity." *Frerck v. Pearson Educ., Inc.*, 63 F. Supp. 3d 882, 892 (N.D. Ill. 2014). Thus, to succeed on this claim, Timaero would have to plead that Boeing's representatives knew or should have known, when promising FAA approval with no simulator training in 2013 and 2014, that Boeing would need to lie to the FAA to gain such approval. But, as highlighted by the promissory fraud analysis above, Timaero's pleadings suggest no such thing. While Boeing failed to disclose the *final* version of the MCAS system to the FAA, the FAA was fully aware of the *original* version and told Boeing it would grant approval for the 737 MAX with no requirement for simulator training under the original MCAS design. (*Id.* ¶¶ 69, 91.) According to Timaero, pressure to expand the use of the MCAS system beyond the original, FAA-approved design did not arise until Boeing received negative results from test flights in 2016. (*Id.* ¶¶ 61–62.) That is two years after the final

communication between Boeing and Timaero in which Timaero argues Boeing propagated any relevant half-truths. (Pl.'s MTD Opp'n at 4–5 (citing Am. Compl. ¶¶ 34–48).) For that reason, Timaero has failed to allege that anyone at Boeing knew or should have known that the statements about FAA approval were misleading half-truths when they made those statements to Timaero in 2013 and 2014.[7] The court thus grants Boeing's motion to dismiss Timaero's fraudulent concealment claim.[8]

### 3. Covenant of good faith and fair dealing

The court also holds that Timaero waived its claim for breach of the covenant of good faith and fair dealing. In Timaero's brief in opposition to Boeing's motion to transfer venue, Timaero stated that it "no longer asserts Count[ ] III (Breach of the Duty of Good Faith and Fair Dealing)." (Pl.'s Transfer Opp'n [48] at 7 n.7.) Months later, when Timaero filed its motion in opposition of Boeing's Motion to Dismiss, Timaero did not defend this claim on the merits, but rather argued only that the court cannot dismiss its good faith and fair dealing claim because the claim is part of Timaero's breach of contract claim and "Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." (Pl.'s MTD Opp'n at 15 (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original).) But the parties agree that Washington state law applies to

---

[7]     On March 11, 2021, Timaero submitted supplemental authority from the Western District of Washington, denying a motion to dismiss fraud claims from the Wilmington Trust Company against Boeing for matters similarly related to the 737 MAX. (Suppl. Mot. [81] citing *Wilmington Tr. Co. v. Boeing Co.*, Case No. 20-cv-402-RSM-MAT, 2021 WL 754030 (W.D. Wash. Feb. 26, 2021).) In particular, Timaero cites a portion of the decision that allowed "knowledge of the issues" with the 737 MAX to be "imputed to the company as a whole." *Wilmington Tr. Co.*, 2021 WL 754030, at *6. The cited portion of that decision is of little moment here, however, because the *Wilmington* court interpreted Washington fraud law rather than Illinois fraud law, and this court's "knowledge" decision does not turn on Timaero's inability to identify the exact individuals at Boeing with knowledge of the issues.

[8]     It bears noting that Illinois law also creates a duty to disclose for "a party who had made a statement which at that time is true, but who subsequently acquires new information which makes it untrue or misleading . . . ." *Druckzentrum Harry Jung GmbH & Co. KG v. Motorola Mobility LLC*, 774 F.3d 410, 418–19 (7th Cir. 2014) (quoting *Williams v. Chi. Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1050, 654 N.E.2d 613, 620 (1st Dist. 1995)). Timaero, however, did not make such an argument here.

the contract claim in this case. (Def.'s Mot. to Transfer at 10; Pl.'s Transfer Opp'n at 7.) And the Washington Supreme Court has explicitly held these to be separate claims. *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180 Wash.2d 102, 111, 323 P.3d 1036, 1041 (2014) ("It is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract." (internal quotations omitted)). To the extent Timaero is attempting to preserve a claim of breach of the duty of Timaero's good faith and fair dealing, that claim is dismissed without prejudice, as well.

For the foregoing reasons, the court Boeing's motion to dismiss Timaero's fraud claims and its good-faith-and-fair-dealing claim without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." (internal quotations omitted)); *see also* FED. R. CIV. P. 15(a)(2).

**B.      Boeing's motion to transfer venue**

Next, the court turns to Boeing's motion to transfer venue to the Western District of Washington. Under 28 U.S.C. § 1404(a), a district court can "transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district." *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010). Specifically, a district court may grant a motion to transfer venue where "(1) venue is proper in the transferor court; (2) venue is proper in the transferee district; and (3) the transfer will serve the convenience of the parties and witnesses as well as the interests of justice." *Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 525 F. Supp. 2d 1039, 1044 (N.D. Ill. 2007). The parties do not dispute that the Western District of Washington, where Boeing maintains corporate offices and manufacturing facilities, would be a proper venue. And Boeing has stipulated that the Northern District of Illinois is itself a proper venue. (Def.'s Mot. to Transfer at 1.) Therefore, this analysis turns on the two questions posed by the third prong: first, whether transfer will serve the convenience of the parties

16

and witnesses; and second, whether transfer is in the interest of justice. *In re Ryze Claim Sols., LLC*, 968 F.3d 701, 707–08 (7th Cir. 2020) ("When deciding whether to transfer a case under § 1404(a) a district court therefore must evaluate both the convenience of the parties and various public-interest considerations." (internal quotations omitted)).

District courts enjoy substantial latitude in making venue transfer decisions. Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to a case-by-case consideration of convenience and fairness." *Rsch. Automation, Inc.*, 626 F.3d at 977 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). The venue provision "permits a flexible and individualized analysis and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations." *Id.* at 978 (internal quotations omitted).

### 1. Convenience of the parties and witnesses

"The party seeking a Section 1404(a) transfer bears the burden of showing that 'the transferee forum is clearly more convenient' than the transferor forum." *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995) (quoting *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989)). "Where the balance of convenience is a close call, merely shifting inconvenience from one party to another is not a sufficient basis for transfer." *Rsch. Automation, Inc.*, 626 F.3d at 978–79. Relevant considerations include the plaintiff's choice of forum, the availability of witnesses, the location of relevant events, and access to documents or sources of proof. *Morton Grove Pharms., Inc.*, 525 F. Supp. 2d at 1044.

### i. Plaintiff's choice of forum

While a plaintiff's choice of forum is ordinarily entitled to deference, Boeing contends that Timaero's choice of forum warrants less respect than it otherwise might. The court agrees for two reasons. First, Timaero is an Ireland-based company, and a foreign plaintiff's choice of forum garners less deference than that of a plaintiff who elects to bring suit in her home forum. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 423 (2007) ("When the

17

plaintiff's choice is not [her] home forum, . . . the presumption in the plaintiff's favor applies with less force, for the assumption that the chosen forum is appropriate is in such cases less reasonable." (internal quotations omitted)).  Moreover, the plaintiff's choice of forum has "minimal value" when "the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum."  *Chukwu v. Air Fr.*, 218 F. Supp. 2d 979, 989 (N.D. Ill. 2002) (quoting *Dunn v. Soo Line R.R. Co.*, 864 F. Supp. 64, 65 (N.D. Ill. 1994)).  Here, little if any material conduct took place in the Northern District of Illinois.  Relevant marketing activities, contract negotiations, and production of the 737 MAX aircraft occurred overseas and in the state of Washington.  (Am. Compl. ¶¶ 37–47; First Decaro Decl. ¶¶ 3, 6.)  Timaero did allege numerous facts suggesting that senior Boeing officials ignored warnings that the 737 MAX was not safe and created the pressures that would lead Boeing employees to cut corners in the design and production processes.  (*See, e.g.*, Am. Compl. ¶¶ 50, 140, 158.)  But Timaero never connected these allegations to fraudulent conduct in the state of Illinois, in the City of Chicago, or at Boeing's Chicago-based headquarters.  At most, Timaero asserts in its briefs that board members present at the August 2011 board meeting resided in or around the Northern District of Illinois at the time of filing.  (Pl.'s Transfer Opp'n at 9.)  But Timaero failed even to state whether that pivotal board meeting itself took place in the Northern District.  (Am. Compl. ¶¶ 23–24.)  For these reasons, the court finds that Timaero's choice of forum deserves little deference in this case.

### ii. Availability of witnesses

"The convenience of the witnesses is often the most important factor in determining whether to grant a motion to transfer."  *First Nat'l Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 913 (N.D. Ill. 2006).  A court should examine the "nature and quality" of each witness's testimony rather than simply "limit[ing] its investigation to a review of which party can produce the longer witness list."  *Vandeveld*, 877 F. Supp. at 1168.  Moreover, "the § 1404 calculus is generally less concerned about the burden that appearing at trial might impose on witnesses who are . . . employees of parties [so called "party witnesses"] . . . because it is presumed that such

witnesses will appear voluntarily." *Ratliff v. Venture Express, Inc.*, 17 C 7214, 2019 WL 1125820, at *11 (N.D. Ill. Mar. 12, 2019). As such, "[m]ore weight is afforded non-party witnesses than witnesses within the control of the parties . . . ."[9] *First Nat'l Bank*, 447 F. Supp. 2d. at 913.

It is undeniable that countless witnesses to the design, sales, and contract negotiation processes are located in the state of Washington. The headquarters to Boeing's Commercial Airlines division as well as most of Boeing's manufacturing facilities are located in the Western District of Washington. (First Decaro Decl. ¶¶ 1, 3; *see also* Am. Compl ¶¶ 37–47.) More specifically, Boeing has identified almost two dozen current Washington residents who corresponded directly with Timaero in the relevant time period. (First Decaro Decl. ¶¶ 8–22; Second Decaro Decl. ¶¶ 3–19.) Timaero's Amended Complaint itself dentified many of these same people as participants in the sales, marketing, and contracting processes. (Am. Compl. ¶¶ 37–47.) And while some of these witnesses currently work for Boeing (First Decaro Decl. ¶¶ 9, 19, 21; Second Decaro Decl. ¶¶ 5, 6, 9, 10, 12, 14, 15, 18), Boeing has identified a number of others whom Boeing no longer employs. (First Decaro Decl. ¶¶ 7, 16, 20, 22; Second Decaro Decl. ¶¶ 7, 8, 13, 16, 19.) For example, Francois Siki, Boeing's ex-Director of Aircraft Contracts, who executed the Purchase Agreement for Boeing, has retired, and is believed to live in the Puget Sound region of Washington. (First Decaro Decl. ¶ 7.)

Timaero, for its part, has largely failed to identify pertinent witnesses residing in the Northern District of Illinois. Boeing's corporate headquarters are in Chicago, but that factor, standing alone, is not enough to defeat a venue transfer motion. *See, e.g.*, *Craik v. Boeing Co.*, 37 F. Supp. 3d 954, 961, 964 (N.D. Ill. 2013) (granting a motion to transfer venue from the Northern District of Illinois to the Western District of Washington despite "the fact that Boeing's

---

[9] There is, in this era, a sense of artificiality about this inquiry. The court agrees with Boeing that the distinction between party and non-party witnesses likely deserves less weight in this case due to the ongoing COVID-19 pandemic, during which it is not particularly easy to transport anybody anywhere, and when so much discovery and deposition practice has taken place on videoconference platforms, whether a witness is 2000 miles away or in an office building across the street.

headquarters and 'overall management and decision making' are in Chicago").  True, Timaero has alleged that senior officials at Boeing knew of potential issues with the 737 MAX early on and pressured employees to meet the company's goals and deadlines surrounding the aircraft.  (*See, e.g.*, Am. Compl. ¶¶ 50, 140, 158.)  But Timaero's allegations did not connect those decisions to individuals who currently reside in the Northern District of Illinois.  The unnamed individuals would be equally (if not more) likely to have been working in Boeing's Washington-based Commercial Airlines headquarters than from Boeing's Chicago-based corporate headquarters.  Timaero urges that this case should remain in the Northern District of Illinois because many of the board members who attended the August 2011 board meeting currently reside in or around this district.  (Pl.'s Transfer Opp'n at 9.)  But testimony from these individuals—regarding Boeing's initial decision to design the 737 MAX to compete with the Airbus 320neo—is, at best, tangentially related to Timaero's fraud claims.  Far more relevant is testimony from on-the-ground employees and managers who knowingly made or approved of fraudulent misrepresentations to Timaero.  These individuals are far more likely to reside in the Western District of Washington than in the Northern District of Illinois.  For these reasons, this factor favors transfer.

### iii.    Situs of material events

In a breach of contract case, the situs of material events is the location "where the business decisions causing the breach occurred."  *First Nat'l Bank*, 447 F. Supp. 2d at 912 (internal quotations omitted).  The same is true "where a claim revolves around large-scale misrepresentations or statements to consumers . . . ."  *Preston v. Am. Honda Motor Co., Inc.*, No. 17 C 3549, 2017 WL 5001447, at *3 (N.D. Ill. Nov. 2, 2017); *see also Jaramillo v. DineEquity, Inc.*, 664 F. Supp. 2d 908, 914 (N.D. Ill. 2009) (finding the situs of material events to be the location where business decisions were made in a suit concerning marketing misrepresentations).

Beyond failing to identify any relevant Chicago-based senior officials at Boeing, Timaero has also failed to identify any conduct that occurred at Boeing's Chicago-based corporate headquarters.  It is perhaps telling that, of the words "Chicago," "Illinois," and "headquarters,"

none appears a single time in Timaero's Amended Complaint outside of the paragraphs stating jurisdiction, venue, and the identity of the parties. According to Boeing, the company's Washington-based BCA division—rather than its Chicago-based corporate headquarters—was responsible for "overseeing the design, engineering, regulatory certification, marketing, sales, assembly, and delivery of the 737 MAX airplane." (Def.'s Mot. to Transfer at 1.) In fact, Timaero acknowledges that pertinent marketing activities between Timaero's and Boeing's representatives occurred at Boeing's Seattle facilities.[10] (Am. Compl. ¶ 47.) While the court acknowledges the likelihood that the Chicago headquarters continued to oversee large-scale decisions affecting company-wide policy, such conduct is less relevant to Timaero's fraud claims than the on-the-ground marketing, sales, design and delivery controlled by the Washington-based BCA headquarters. Accordingly, this factor favors transfer.

### iv. Access to forum/sources of proof

The parties agree that access to documents has little significance in this case. Boeing maintains hard copies of the original contracts in the State of Washington, but "[i]n this day and age, transferring documents from one district to another is commonplace and . . . no more costly than transferring them across town." *Rabbit Tanaka Corp. USA v. Paradies Shops, Inc.*, 598 F. Supp. 2d 836, 840 (N.D. Ill. 2009). And the parties' access to the forum is neutral as well. For Timaero, an Ireland-based company with no connections to either Chicago or Washington, each forum is equally inaccessible. Boeing, on the other hand, has extensive connections to both forums, with its corporate headquarters in Chicago but its entire Commercial Airlines division in the Western District of Washington. This factor thus has little bearing on the court's decision.

---

[10] Although these meetings (March 22–29, 2014) took place after Timaero had signed the initial Purchase Agreement (January 10, 2014), they took place before Timaero had signed the Supplemental Agreement in which Timaero agreed to purchase two additional 737 MAX aircraft (September 15, 2016). (Am. Compl. ¶¶ 47, 175.)

On balance, the availability of witnesses and location of material events both favor transfer. Boeing has thus met its burden of showing that the Western District of Washington is clearly more convenient for the parties and witnesses than the Northern District of Illinois.

### 2. Interest of justice

"The 'interest of justice' is a separate element of the transfer analysis that relates to the efficient administration of the court system" rather than the private considerations of the litigants. *Rsch. Automation, Inc.*, 626 F.3d at 978; *see also Vandeveld*, 877 F. Supp. at 1169. Ultimately, the interest of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986). Relevant considerations include docket congestion, each court's relative familiarity with controlling law, and the desirability of resolving the case in each forum. *Rsch. Automation, Inc.*, 626 F.3d at 978. These "interest of justice" standards support Boeing's transfer argument, if only slightly.

### i. Docket congestion

First, the parties cite competing statistics concerning the speediness of the federal courts at issue. As of September 2019, Boeing observes, the "median time from filing to trial" was 36.7 months in the Northern District of Illinois while it was only 19.7 months in the Western District of Washington. (Def.'s Mot. to Transfer at 9.) Timaero, in contrast, notes the "median time from filing to *disposition* for civil cases," which is 7.4 months in the Northern District of Illinois and 7.6 months in the Western District of Washington. (Pl.'s Transfer Opp'n at 7 (emphasis added).) Boeing's statistics appear to be the relevant ones. *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 958 (7th Cir. 2007) ("To the extent that court congestion matters, what is important is the speed with which a case can come to trial and be resolved.") (emphasis added). While it is true that the COVID-19 pandemic likely makes these statistics less predictive than usual, the September 2020 median time "from filing to trial" numbers similarly suggest that the Western District of Washington (18.1 months to trial) remains far less congested than the Northern

District of Illinois (39.3 months to trial). *U.S. District Courts—Time Intervals From Filing Date to Beginning Date for Completed Civil Trials, by District, During the 12-Month Period Ending September 30, 2020*, UNITED STATES COURTS 2, 3, https://www.uscourts.gov/sites/ default/files/data_tables/jb_t3_0930.2020.pdf (last visited Mar. 12, 2021). Accordingly, this factor favors transfer.

### ii.    Familiarity with relevant law

In diversity cases, it is generally "advantageous to have federal judges try a case who are familiar with the applicable state law." *Coffey*, 796 F.2d at 221. But "where the law in question is neither complex nor unsettled, the interests of justice remain neutral between competing courts." *First Nat'l Bank*, 447 F. Supp. 2d at 914. This is because "federal judges routinely apply the law of a State other than the State in which they sit." *In re Ryze Claim Sols., LLC*, 968 F.3d at 709 (quoting *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for West. Dist. of Tex.*, 571 U.S. 49, 67 (2013)). So unless either party can identify features of state law that are "exceptionally arcane," this factor has little weight. *Id.*; *see also Aliano v. Quaker Oats Co.*, No. 16 C 3087, 2017 WL 56638, at *3 (N.D. Ill. Jan. 4, 2017) ("[N]or have Plaintiffs identified any unique or idiosyncratic aspect of Illinois law at issue here that would make this court's purported greater familiarity with Illinois law significant.").

In any event, this factor may be a wash: the parties agree that the breach of contract claim is governed by Washington state law, while the fraud claims are governed by Illinois law. (Pl.'s Transfer Opp'n at 7; Def.'s MTD at 5 n.3; Def.'s Mot. to Transfer at 10.) Basic contract law, however, is neither arcane nor idiosyncratic. *Preussag Int'l Steel Corp. v. Ideal Steel & Builders' Supplies, Inc.*, No. 03 C 6643, 2004 WL 783102, at *7 (N.D. Ill. Jan. 21, 2004) (expressing confidence that "any federal judge can properly and easily adjudicate" basic contract claims regardless of which state's law applies); *see also Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 962 (N.D. Ill. 2000) (noting that "contract law is not particularly complex" and is certainly not "beyond the comprehension" of a foreign forum). Nor has either party provided the court with

23

any reason to believe that Illinois fraud law is particularly complex or unsettled. Judges in either district are capable of adjudicating Timaero's claims. This factor is thus neutral.[11]

### iii. Desirability of resolving the case in each locale

Timaero presents the results of juror surveys to argue that a fair trial cannot be had in Washington. Timaero's retained expert witness Dr. Bryan Edelman who conducted an online survey in both the Northern District of Illinois and the Western District of Washington and found "a significant number of prospective jurors" in the Western District were predisposed to favor Boeing at trial. (Juror Survey, Ex. 5 to Kosma Decl. in Support of Pl.'s Transfer Opp'n [49-5, 50] (hereinafter "Juror Survey"), at 1.) In the Western District of Washington, 55% of survey respondents replied they would favor Boeing in a case similar to this one while only 28% said they would favor Timaero. (*Id.* at 2.) In the Northern District of Illinois, those same numbers were 42% in favor of Boeing and 40% for Timaero. (*Id.*) Edelman attributes this difference in "bias" to the fact that Boeing—the largest employer in the state of Washington—has such a pervasive economic presence in the state's Western District. (*Id.* at 1–2, 13; Pl.'s Transfer Opp'n at 5–6.)

In arguing here that such juror bias militates against transfer, Timaero cites to *United States v. Sablan* from the Eastern District of California. No. 1:08–CR–00259–PMP, 2014 WL 7335210 (E.D. Cal. Dec. 19, 2014). *Sablan* is not controlling authority, and the difficulties of overcoming juror bias in a criminal case have little obvious application in a commercial dispute. The percentage of respondents reportedly favoring Boeing (55 percent) is higher than the percentage in Illinois who answered the same way (42 percent), but *voir dire* processes can be effective in ensuring fairness. Moreover, as Boeing points out, "it is a goal—not a problem—of

---

[11]    The court does not consider Timaero's "good faith and fair dealing" claim in this analysis because, as stated above, Timaero indicated in its brief opposing Boeing's transfer motion that it intended to drop this claim entirely. (Pl.'s Transfer Opp'n at 7 n.7.) If the court were to include this claim in its analysis, this factor too would favor transfer, as in Illinois, the covenant of good faith and fair dealing is not available as an independent source of liability; rather, it is treated only as a rule of construction. *Voyles v. Sandia Mortg. Corp.*, 196 Ill.2d 288, 297, 751 N.E.2d 1126, 1131 (2001).

the federal court system to allow members of the community from which the controversy arose to sit on the jury panel and decide the community-related case." *Doage v. Bd. of Regents*, 950 F. Supp. 258, 260 (N.D. Ill. 1997). In the court's view, the Northern District of Illinois (where Boeing has its headquarters) and the Western District of Washington (where it has manufacturing facilities) have equally strong interests in the resolution of this case.[12]

The interest-of-justice factors are largely neutral, but because convenience factors strongly support transfer, Boeing's motion will be granted. This case will be transferred to the Western District of Washington.

## **CONCLUSION**

Boeing's motion to dismiss [60] and to transfer [33] are granted. The court dismisses Timaero's fraud claims and good faith claim without prejudice to the filing of an amended complaint. The court orders transfer of this case to the Western District of Washington.

ENTER:

Dated: March 15, 2021

REBECCA R. PALLMEYER
United States District Judge

---

[12] Timaero also argues that the Northern District of Illinois has an interest in resolving this case because the State of Illinois and City of Chicago gave Boeing an estimated $60 million in tax breaks when Boeing moved its headquarters to Chicago in 2001. (Pl.'s Transfer Opp'n at 4–5.) The court is unmoved by this. That Boeing received tax breaks from local authorities in 2001 says nothing about the propriety of litigating an Ireland-based company's claims in a federal court here.